UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

REBBECCA GOODALL,
f/k/a REBBECCA SCHWARTZ,

       Plaintiff,

v.                                    Case No. 8:18-cv-3009-T-35TGW

AMERICAN EXPRESS
COMPANY, d/b/a AMERICAN
EXPRESS CENTURIAN BANK
CORPORATION,[1]

       Defendant.

_____

## REPORT AND RECOMMENDATION

This case came on to be heard upon Defendant American Express National Bank's Motion to Compel Arbitration (Doc. 17).  Because there is a valid and enforceable arbitration agreement between the parties, I recommend that the motion be granted and the matter be referred to arbitration.

---

[1] American Express Centurion Bank changed its name to American Express National Bank on April 1, 2018 (see Doc. 17-1, p. 2, n.1).

I.

The plaintiff, Rebbecca Goodall, opened an American Express credit card account (the Account) in September 2006 (Doc. 17-1, p. 3, ¶ 3).[2] The Account was governed by a Cardmember Agreement that contained an Arbitration Provision (id., ¶ 4).  That provision stated (id., p. 21):

> You or we may elect to resolve any claim by individual arbitration… If arbitration is chosen by any party, neither you nor we will have the right to litigate that claim in court or have a jury trial on that claim.

The defendant, American Express National Bank (AMEX), formally amended the Arbitration Provision in 2012 (Doc. 17-1, pp. 101-02). The amendment allowed for a cardholder to "reject this arbitration provision by sending a written rejection notice . . . by February 15, 2013" (id., pp. 102, 105).  Goodall did not reject the Arbitration Provision (id., p. 3, ¶ 7).

At some point prior to 2017, Goodall fell behind on her credit card payments (Doc. 1, p. 4, ¶ 20).  On September 7, 2017, AMEX filed suit against Goodall in state court (id, pp. 4-5, ¶ 21).  Goodall signed a Stipulation for Settlement (Stipulated Settlement), which reduced the debt owed on her

---

[2]In considering a motion to compel arbitration, the court can consider evidence outside of the pleadings.  Banks v. Cashcall, Inc., 188 F. Supp. 3d 1296, 1303 n.3 (M.D. Fla. 2016).

American Express credit card to $2,250 (Doc. 1, p. 5, ¶ 23). By its terms, Goodall was required to pay $1,250 before November 2, 2017, and to make monthly payments of $100 until paid in full (id., ¶ 24). Goodall made the final payment due under the Stipulated Settlement on or about August 20, 2018 (id.).

Goodall filed this action on December 13, 2018. In her one-count complaint, Goodall alleged that, from the time she and AMEX entered into the Stipulated Settlement until the time of filing suit, AMEX repeatedly violated the Fair Credit Reporting Act (FCRA), 15 U.S.C. 1681s-2(b), by reporting false, inaccurate, and incomplete information to the credit reporting agencies, and by failing to properly investigate and reinvestigate the accuracy of the information it reported after she disputed its reports in May, September, and October 2018 (Doc. 1, pp. 9-10, ¶¶ 62-68). Specifically, Goodall alleged that AMEX (1) falsely reported and continued to report a balance owed of more than $3,000, that the debt was past due, and that the debt was "charged off," and (2) failed to report that she was making partial payments under the Stipulated Settlement, that her payments were made timely, and that she fully complied with all terms of the Stipulated Settlement and made her final payment in August 2018 (id., pp. 5-9, ¶¶ 26-61).

3

AMEX responded to the complaint by filing a motion to compel arbitration pursuant to the Federal Arbitration Act (FAA). It argues that the parties are bound to a valid agreement to arbitrate, namely, the Arbitration Provision in the Cardmember Agreement, and that Goodall's FCRA claims are within the scope of that agreement (Doc. 17, pp. 3-5). In support, it submits the declaration of Keith C. Herr, its records custodian, as well as copies of the various Cardmember Agreements that governed Goodall's Account from 2010 to present (Doc. 17-1, pp. 2-105).[3]

Goodall responds that AMEX cannot compel arbitration because her FCRA claims fall outside of the scope of the Arbitration Provision, and AMEX waived its right to arbitrate by filing the collection lawsuit (Doc. 23, pp. 5-12).[4] She also takes issue with two factual assertions made by AMEX, i.e., that she currently "holds" a credit card account with AMEX and that she "signed" any of the Cardmember Agreements (id., p. 4). According to

---

[3]The Arbitration Provision set forth in Part 2 of the 2010 Cardmember Agreement (see Doc. 17-1, pp. 21-22) was formally amended in 2012 (see id., pp. 94, 102-05). Since that time, the portions of the Arbitration Provision pertinent to the instant dispute have remained unchanged (see id., pp. 36-37 (October 2016), 54-55 (November 2016), 70-71 (February 2017), 86-87 (September 2018)).

[4]Goodall does not submit documents or declarations in support of her arguments. Nor does she dispute or otherwise challenge the documents and declaration submitted by AMEX.

4

Goodall, she "never signed any arbitration agreement," and, therefore, AMEX must argue that she assented to arbitration by using, signing, or keeping the credit card (id.). Further, Goodall claims that she no longer "holds" a credit card with AMEX because it closed her account, and this "past-tense" status of her contractual relationship with AMEX "impacts whether [she] must arbitrate her FCRA claims" (id.).

Oral arguments on AMEX's motion were held subsequently.

II.

Under the FAA, a written arbitration provision in a "contract evidencing a transaction involving commerce" is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. 2. "The FAA places arbitration agreements on equal footing with all other contracts and sets forth a clear presumption–'a national policy'–in favor of arbitration." Parnell v. CashCall, Inc., 804 F.3d 1142, 1146 (11th Cir. 2015).

The court generally conducts a two-step inquiry to decide whether the parties must submit to arbitration. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985); Klay v. Pacificare Health Sys., Inc., 389 F.3d 1191, 1200 (11th Cir. 2004). The first step is to

decide whether the parties agreed to arbitrate the dispute. <u>Mitsubishi Motors Corp</u>. v. <u>Soler Chrysler-Plymouth, Inc.</u>, <u>supra</u>, 473 U.S. at 626. "This determination depends on two considerations: (1) whether there is a valid agreement to arbitrate between the parties; and (2) whether the dispute in question falls within the scope of that arbitration agreement." <u>Fleetwood Enter., Inc.</u> v. <u>Gaskamp</u>, 280 F.3d 1069, 1073 (5th Cir. 2002). If the court finds that the parties agreed to arbitrate, it must then determine "whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims."[5] <u>Mitsubishi Motors Corp</u>. v. <u>Soler Chrysler-Plymouth, Inc.</u>, <u>supra</u>, 473 U.S. at 628.

The FAA governs the validity of an arbitration agreement; however, state law governs whether an enforceable contract or agreement to arbitrate exists. <u>Caley</u> v. <u>Gulfstream Aerospace Corp.</u>, 428 F.3d 1359, 1368 (11th Cir. 2005). "The federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law."[6] <u>Delano</u> v. <u>Mastec, Inc.</u>, 10-cv-320-T-27MAP, 2010 WL 4809081 at *2 (M.D. Fla. Nov. 18, 2010). Moreover, "as a matter of federal law, any doubts concerning the

_____

[5]Neither party addresses this step.

[6]The parties both cite to federal and Florida law. Neither addresses the governing law provision in the Cardmember Agreement, which is Utah law (<u>see</u> Doc. 35-1, p. 12).

scope of arbitrable issues should be resolved in favor of arbitration." <u>Moses</u>
<u>H. Cone Mem. Hosp.</u> v. <u>Mercury Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983).

III.

A.   AMEX contends its Cardmember Agreement demonstrates
a valid agreement to arbitrate.  The Cardmember Agreement states that
"[w]hen you use the Account (or you sign or keep the card), you agree to the
terms of the Agreement" (Doc. 35-1, p. 8).  Additionally, Part 2 of the
Cardmember Agreement contains a section on Claims Resolution, which
includes, among other things, an arbitration provision (<u>id.</u>, p. 13).  The
Arbitration Provision states, in pertinent part (<u>id.</u>):

> You or we may elect to resolve any claim by
> individual arbitration... If arbitration is chosen by
> any party, neither you nor we will have the right to
> litigate that claim in court or have a jury trial on
> that claim.

Goodall assented to the terms of the Cardmember Agreement (and therefore
the Arbitration Provision) by using the Account and by keeping the credit
card.

Accordingly, AMEX demonstrates that the parties entered into
a valid agreement to arbitrate.  Moreover, Goodall did not seriously dispute
that she entered into a valid agreement to arbitrate with AMEX in her

7

response, and she conceded it again at oral argument.[7]  Whether Goodall's FCRA claims fall within the scope of the Arbitration Provision is another matter.

B.    "The FAA reflects the fundamental principle that arbitration is a matter of contract." Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 67 (2010).  Therefore, the scope of an arbitration agreement depends on the intent of the parties.  Seaboard Coast Line R.R. v. Trailer Train Co., 690 F.2d 1343, 1352 (11th Cir. 1982).  Accordingly, "a party cannot be required to submit to arbitration any dispute which she has not agreed so to submit." AT&T Technologies, Inc. v. Communication Workers of America, 475 U.S. 643, 648 (1986).

On the other hand, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." District No. 1-Marine Engineers Beneficial Ass'n, AFL-CIO v. GFC Crane Consultants,

---

[7]In any event, to establish a genuine issue of fact regarding the existence of a valid agreement to arbitrate, a plaintiff must unequivocally deny the arbitration agreement and produce evidence to substantiate the denial.  Chastain v. The Robinson Humphrey Co., 957 F.2d 851, 854 (11th Cir. 1992).  Goodall does neither.

331 F.3d 1287, 1290 (11th Cir. 2003) quoting Wright v. Universal Mar. Serv.
Corp., 525 U.S. 70, 78 (1998).  Consequently, "[t]o determine what disputes
the parties agreed to arbitrate, [the court must begin] with the language of the
applicable arbitration provision, keeping in mind 'that any doubts concerning
the scope of arbitrable issues should be resolved in favor of arbitration.'"
World Rentals & Sales, LLC v. Volvo Construction Equipment Rents, Inc.,
517 F.3d 1240, 1245 (11th Cir. 2008).

   As indicated, the Arbitration Provision in this case states that
"You or we may elect to resolve any claim by individual arbitration" (Doc.
35-1. p. 13).  Moreover, it is broadly drafted to cover "any current or future
claim, dispute or controversy *relating to your Account(s), this Agreement, or
any agreement or relationship you have or had with us*, . . . includ[ing] . . .
claims based upon . . . statute" (Doc. 35-1, p. 13) (emphasis added).  The
Eleventh Circuit has held that broad clauses containing the "relating to"
language require some direct connection between the dispute and the contract.
See Doe v. Princess Cruise Lines, Ltd., 657 F.3d 1204, 1219 (11th Cir. 2011).

   Goodall's FCRA claims relate to the contract at issue—the
Cardmember Agreement—because the Cardmember Agreement specifically

addresses AMEX's reporting obligations regarding Goodall's account information.  Thus, the Cardmember Agreement states:

> **Credit reports**.  You agree that we will give information about the Account to credit reporting agencies.  We will tell a credit reporting agency if you fail to comply with any term of this Agreement.  This may have a negative impact on your credit report.

(Doc. 35-1, p. 11).

Further, in the Arbitration Provision, the Cardmember Agreement includes a continuation clause.  That provision states that "[t]his section will survive termination of your Account, voluntary payment of your Account balance, any legal proceeding to collect a debt, any bankruptcy and any sale of your Account . . ." (id., p. 14).

Goodall's FCRA claims fall within the scope of the broadly worded Arbitration Provision because the claims are related to Goodall's Account <u>and</u> to any relationships Goodall has, or had, with AMEX.  Thus, the Arbitration Provision extends beyond claims relating to the Cardmember Agreement, because it includes claims "relating to" a cardmember's account and any relationship that a cardmember had or has with AMEX.  See e.g., Belke v. <u>Merrill Lynch, Pierce, Fenner & Smith</u>, 693 F.2d 1023, 1028 (11th

10

Cir. 1982) ("An arbitration clause covering disputes arising out of the contract *or* business [relationships] between the parties evinces a clear intent to cover more than just those matters set forth in the contract."), overruled on other grounds by <u>Dean Witter Reynolds, Inc.</u> v. <u>Byrd</u>, 470 U.S. 213 (1985).

In sum, the Arbitration Provision in the Cardmember Agreement compels arbitration of Goodall's FCRA claims in this case because the claims are related to Goodall's Account and are related to a relationship that Goodall had with AMEX. <u>See</u> <u>Gamboa</u> v. <u>Citibank, National Association,</u> 1:16-CV-2349-MHC, 2016 WL 9454417 at *3 (N.D. Ga. Oct. 28, 2016) (finding that the arbitration provision encompassed claims at issue because the arbitration provision extended to the plaintiff's "relationship" with the defendant, as well as the account); <u>Mayfield</u> v. <u>Comcast Cable Communications Management, LLC</u>, 1:15-CV-483-CAP2015 WL 10173611 at *2 (N.D. Ga. June 19, 2015) (compelling arbitration where the agreement covered claims regarding any aspect of the plaintiff's relationship with the defendant).

Goodall's argument to the contrary is based on the Eleventh Circuit's unpublished decision in <u>Gamble</u> v. <u>New England Auto Finance, Inc.,</u> 735 Fed. Appx. 664 (11th Cir. 2018). That decision is inapposite.

11

In <u>Gamble</u>, the plaintiff entered into a loan agreement for a vehicle with the defendant. The agreement contained an arbitration provision "requiring arbitration of any 'claim, dispute or controversy ... whether preexisting, present or future, that in any way arises from or relates to this Agreement or the Motor Vehicle securing this agreement.'" <u>Id.</u> at 665. The loan agreement, which had a specific signature line, was followed by a "Text Consent Provision" granting the defendant the right to send customers communications, including texts, which required a separate signature. <u>Id.</u> The plaintiff signed the loan agreement, but she did not sign the text consent provision. <u>Id.</u> After the plaintiff paid off the loan, she received multiple text messages from the defendant about a new loan, and the defendant continued to send her texts after she requested that it stop. <u>Id.</u>

The plaintiff then filed a class action complaint against the defendant for violations of the Telephone Consumer Protection Act (TCPA). <u>Id.</u> The defendant moved to compel arbitration, arguing that the TCPA claims were subject to arbitration pursuant to the arbitration provision in the loan agreement, but the district court denied the motion. <u>Id.</u> On appeal, the defendant argued that the TCPA claims were arbitrable because they "'touche[d] matters' within the Loan Agreement containing the Arbitration

12

Provision." Id. In its view, "the complaint asserts that it lacked her express prior consent to send text messages to her cellular telephone number, and that it is the Text Consent Provision which governs this lack of consent (and thus NEAF's alleged TCPA violations)." Id. at 665-66. As a result, the defendant argued that the plaintiff's TCAP claims were arbitrable because "the complaint inextricably ties a *prima facie* element of the TCPA claim—lack of consent—to the Loan Agreement." Id. at 666.

The Eleventh Circuit disagreed, reasoning that the TCPA claims did not arise "from the loan agreement or any breach of it," but rather "from post-agreement conduct that allegedly violate[d] a separate, distinct federal law[,]" and the defendant's "sending of the text messages does not relate to or arise from its lending money to [the plaintiff], [the plaintiff's] repayment of the loan, or the vehicle which secured the loan." Id. at 666. Thus, it held that the plaintiff's TCPA claims were not subject to arbitration because they "did not 'in any way arise [ ] from or relate[ ] to' the Loan Agreement," and "because the Arbitration Provision covered only those disputes arising from or related to the Loan Agreement or motor vehicle securing that agreement." Id. at 667.

13

Importantly, the court of appeals viewed the Loan Agreement—which the plaintiff did sign—as being separate and distinct from the Text Consent Provision—which the plaintiff did not sign. The court concluded (id.):

> NEAF cannot avoid the strictures of the TCPA, and force arbitration of its alleged TCPA violations, by placing the request for consent to receive text messages in the same document as, but after and apart from, a separate and independent contract, and then, after it failed to get the individual's consent, claim that the consent request was actually part of that contract. We will not accept NEAF's invitation to bootstring independent TCPA claims to a completely distinct contract.

> The bottom line is that Ms. Gamble's TCPA claims did not "in any way arise[ ] from or relate[ ] to" the Loan Agreement, and the parties did not agree to arbitrate those TCPA claims.

There is nothing similar here to the unusual facts in Gamble. In this case, the terms of the Cardmember Agreement and Arbitration Provision are broad enough to encompass Goodalls's FCRA claims. Moreover, the claims are related to AMEX's performance under the Cardmember Agreement, namely, its reporting of obligations to the credit reporting companies. As such, unlike in Gamble, the plaintiff's claims are not for

conduct that is independent of the Cardmember Agreement. Rather, and significantly, AMEX's reporting was done under and pursuant to the terms of the Cardmember Agreement. Consequently, Goodall's FCRA claims are related to AMEX's reporting obligations under the Cardmember Agreement and are related to the Account and to any relationship Goodall has or had with AMEX. Therefore, they are within the scope of the Arbitration Provision.

Furthermore, the fact that Goodall's FCRA claims are statutory in nature does not render them unarbitrable. "Federal statutory claims are as a rule arbitrable." Anders v. Hometown Mortgage Services, Inc., 346 F.3d 1024, 1030 (11th Cir. 2003); see Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991); Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 226 (1987). The Supreme Court has recognized that "[b]y agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1983). While not all statutory claims may be subject to arbitration, "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." Id. The party seeking

15

to avoid arbitration bears the burden of showing that Congress intended to preclude a waiver of a judicial forum for the statutory claim at issue. Id. at 627. If Congress intended to do so, its intention will be discernable in the statute's text or legislative history, or from an inherent conflict between arbitration and the statute's underlying purposes. Shearson/American Exp., Inc. v. McMahon, 482 U.S. 220, 226 (1987).

Thus, to avoid arbitration, Goodall must show that Congress intended to make an exception to the FAA for claims arising under the FCRA. Goodall not only fails to meet the burden of demonstrating this, she does not even allege that Congress intended to preclude a waiver of judicial forum for claims arising under the FCRA. Consequently, Goodall points to nothing in the text or legislative history of the FCRA evincing such an intent. Nor does she claim an inherent conflict between arbitration and the underlying purposes of the FCRA or point to a case finding such a conflict. To the extent she contends that such a conflict exists based on the reasoning in Gamble, the statutory claim at issue in that case was not an FCRA claim. Moreover, the court in Gamble declined to compel arbitration not because it involved a statutory based claim, but because the claim was not covered by the Arbitration Provision in the Loan Agreement.

On the other hand, AMEX cites several cases which have concluded that FCRA claims are subject to arbitration. See, e.g., Sherer v. Green Tree Services LLC, 548 F.3d 379, 382 (5th Cir. 2008) (holding that the plaintiff's FCRA claims fell within the terms of the loan agreement's arbitration clause); Everett v. Screening Reports, Inc., 117-cv-00071-ELR-CMS, 2017 WL 8186823 at *2 (N.D. Ga. May 5, 2017) (finding that courts in this circuit (and elsewhere) have found that FCRA claims are arbitrable); Johnson v. Springleaf Financial Services, 2:15-cv-1268-RDP, 2015 WL 4985472 at *2 (N.D. Ala. Aug. 20, 2015) (finding that the plaintiff's FCRA claim was arbitrable because the court "cannot say that Congress did not intend FCRA claims to be subject to arbitration"); Campbell v. Verizon Wireless, LLC, 14-0517-WS-N, 2015 WL 416484 *8 (S.D. Ala. Jan. 29, 2015) (finding that the plaintiff's FCRA claim was arbitrable because he had not pointed to any clear, specific expression by Congress that claims brought under the FCRA should not be referred to arbitration); Inetianbor v. CashCall, Inc., 923 F. Supp. 2d 1358, 1361-63 (S.D. Fla. 2013) (granting motion to compel arbitration of FCRA claim).

For these reasons, Goodall's FCRA claims are arbitrable under the FAA, and she fails to demonstrate otherwise.

C.   Goodall also contends that AMEX waived its right to arbitration by suing her on her credit card debt. This contention is meritless.

"Although arbitration agreements governed by the FAA are to be liberally enforced, courts will not compel arbitration when the party who seeks to arbitrate has waived its right to do so." Krinsk v. SunTrust Banks, Inc., 654 F.3d 1194, 1200 (11th Cir. 2011). The determination of "whether [a defendant] waived [its] right to arbitration . . . is controlled solely by federal law." S & H Contractors, Inc. v. A.J. Taft Coal Co., 906 F.2d 1507, 1514 (11th Cir. 1990).

This determination is made using a two-part test. Garcia v. Wachovia Corp., 699 F.3d 1273, 1277 (11th Cir. 2012). First, the court decides if, under the totality of the circumstances, the party has acted inconsistently with its arbitration rights, such as by "substantially invok[ing] the litigation machinery prior to demanding arbitration." Id. Second, the court considers whether, by acting inconsistently with the arbitration right, that party has prejudiced the other party based on factors such as "the length of delay in demanding arbitration and the expense incurred by that party from participating in the litigation process." Id. "Waiver of arbitration is not to be lightly inferred." Wilson v. Par Builders II, 879 F. Supp. 1187, 1189 (M.D.

18

Fla. 1995). The party contending there is a waiver "bears a heavy burden of proof" under this two-part test. Krinsk v. SunTrust Banks, Inc., supra, 654 F.3d at 1200 n.17.

Goodall fails to meet this burden. Goodall's sole reason for contending that AMEX acted inconsistently with its arbitration rights is that it did so by bringing the collection lawsuit. In support, Goodall relies on the following language from Gutierrez v. Wells Fargo Bank, NA, 889 F.3d 1230, 1236-37 (11th Cir. 2018):

> Careful examination of [Eleventh Circuit] precedent reveals that the purpose of the waiver doctrine is to prevent litigants from abusing the judicial process. Acting in a manner inconsistent with one's arbitration rights and then changing course mid-journey smacks of outcome-oriented gamesmanship played on the court and the opposing party's dime. The judicial system was not designed to accommodate a defendant who elects to forego arbitration when it believes that the outcome in litigation will be favorable to it, … and then suddenly changes course and pursues arbitration when its prospects of victory in litigation dim. Allowing such conduct would ignore the very purpose of alternative dispute resolution: saving the parties' time and money.

(Doc. 23, pp. 10-11).

19

Goodall's argument is meritless. First, her reliance on <u>Gutierrez</u> is inapposite. In that case, the court was discussing instances in which a defendant engages in gamesmanship by changing its course and conduct midway through a lawsuit. <u>See</u> <u>Gutierrez</u> v. <u>Wells Fargo Bank, NA</u>, <u>supra</u>, 889 F.3d at 1236-37. That is not the case here. Goodall's "gamesmanship" argument simply carries no weight in a context such as this where the conduct complained of occurs in a separate lawsuit that involves entirely different claims and is brought by the other party. The same is true with respect to her "no fair notice" argument. Here, AMEX moved to compel arbitration at the earliest possible time in this litigation. AMEX's actions in the collection lawsuit have no bearing on the notice Goodall received in this case as to AMEX's intent to exercise its right to arbitration in this litigation.

Second, Goodall cites no persuasive authority to support her assertion that a party waives its right to arbitration in a second lawsuit.[8]

---

[8]Goodall cites <u>S & H Contractors, Inc.</u> v. <u>A.J. Taft Coal Co.</u>, 906 F.2d 1507, 1514 (11th Cir. 1990); <u>Garcia</u> v. <u>Wachovia Corp.</u>, 699 F.3d 1273, 1277 (11th Cir. 2012); and <u>Gutierrez</u> v. <u>Wells Fargo Bank, NA</u>, 889 F.3d 1230, 1236-37 (11th Cir. 2018) (<u>see</u> Doc. 23, pp. 10-11). None of these cases addressed instances involving prior litigation. Additionally, at the hearing, Goodall proffered <u>Ivax Corp.</u> <u>B. Braun of America, Inc.</u>, 286 F.3d 1309 (11th Cir. 2002); and <u>Grigsby & Associates, Inc.</u> v. <u>M Securities Investment</u>, 635 Fed. Appx. 728, 732 (11th Cir. 2015). <u>Grigsby</u> involved a party that had filed other lawsuits, but all were found to be insubstantial. <u>See id.</u> <u>Ivax</u> involved a prior litigation against a third party and thus is distinguishable.

Further, Goodall fails to address that the Cardmember Agreement includes a waiver provision: **"We do not waive our rights.** We may choose to delay enforcing or to not exercise rights under this Agreement. If we do this, we do not waive our rights to exercise or enforce them on any other occasion." (Doc. 35-1, p. 12).

Also, there is no merit to Goodall's argument that AMEX substantially invoked the litigation machinery by bringing the collection lawsuit prior to demanding arbitration in this case. Goodall cites no authority to support the proposition that filing a complaint and thereafter settling the dispute expeditiously amounts to substantial litigation activity. Accordingly, AMEX has not "substantially invoked the litigation machinery" prior to demanding arbitration such that it has acted inconsistently with its right to enforce the Arbitration Provision with respect to Goodall's FCRA claims, and Goodall does not demonstrate otherwise.

Even if Goodall could demonstrate that AMEX acted inconsistently with the right to arbitrate by bringing the collection lawsuit, she fails to demonstrate the requisite prejudice necessary to satisfy the second prong of the analysis. The sum of Goodall's prejudice argument is that she incurred expenses related to defending the state-court litigation and, due to

21

AMEX's FCRA violations, she has incurred additional expenses to vindicate her rights under federal law (Doc. 23, p. 12).

Goodall, however, has not provided any evidence, or even any specific information, regarding the amount of time spent or the expenses incurred during this litigation or the collection lawsuit as required. See Grigsby & Assocs., Inc. v. M Sec. Inv., supra, 635 Fed. Appx. at 733-34 n.10 (affirming district court's ruling that no waiver occurred in part because the party opposing arbitration "failed to submit evidence of any expenses he incurred in connection with these lawsuits"); Pirtek USA, LLC v. Twillman, 6:16-cv-1302-Orl-37TBS, 2016 WL 7116205 at *6 (M.D. Fla. Dec. 7, 2016) (finding that the plaintiff did not waive its arbitration right in part because "Defendants failed to offer any specific evidence: (1) of their expenditures ... in this Court; or (2) concerning whether such expenditures exceed what Defendants would have spent ... in arbitration instead").

D.    Lastly, upon a finding that the parties entered into a valid, enforceable arbitration agreement that covers the instant dispute, AMEX requests that the court enter an order compelling arbitration of Goodall's claims and staying these proceedings (Doc. 17, pp. 5-6).

22

"The FAA provides for stays of proceedings in federal district courts when an issue in the proceeding is referable to arbitration, and for orders compelling arbitration when one party has failed or refused to comply with an arbitration agreement." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 289 (2002).   Moreover, if a case involves an "issue referable to arbitration under an agreement in writing," the court must stay the action upon a motion asking for a stay from any party within the suit.  9 U.S.C. 3.

Accordingly, it is appropriate to order the parties to arbitrate and to stay the case while arbitration proceedings are pending.

## IV.

For the foregoing reasons, it is recommended that:

(1)  Defendant American Express National Bank's Motion to Compel Arbitration (Doc. 17) be granted;

(2)  The parties be directed to submit to arbitration and to file periodic reports with the court on the status of arbitration;

(3)  The case be stayed pending the arbitration process; and

(4)  The Clerk of Court be directed to stay and administratively close the case pending the completion of arbitration.

Respectfully submitted,

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

DATED: AUGUST 26 , 2019

## NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  11th Cir. R. 3-1.

24